**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                                    )
**AMERICAN BUS ASSOCIATION, INC.**                  )
                                                    )
        **Plaintiff,**                              )
                                                    )
            v.                                      )        **Civil Action No. 10-686 (ESH)**
                                                    )
**PETER M. ROGOFF,**                                )
**Administrator,**                                  )
**Federal Transit Administration,**                 )
**U.S. Department of Transportation,** _et al.,_    )
                                                    )
        **Defendants.**                             )
_____)


_____
                                                    )
**UNITED MOTORCOACH**                               )
**ASSOCIATION, INC.,**                              )
                                                    )
        **Plaintiff,**                              )
                                                    )
            v.                                      )        **Civil Action No. 10-701 (ESH)**
                                                    )
**PETER M. ROGOFF,**                                )
**Administrator,**                                  )
**Federal Transit Administration,**                 )
**U.S. Department of Transportation,**              )
                                                    )
        **Defendant.**                              )
_____)


## <u>MEMORANDUM OPINION</u>

        The above-captioned cases involve suits by charter bus trade associations against the

Federal Transit Administration ("FTA" or "the agency"), a division of the Department of

Transportation ("DOT"), and/or Peter M. Rogoff, the FTA Administrator.  Because both

plaintiffs allege identical constitutional violations of the First and Fifth Amendments and of the

doctrine of separation of powers, the Court will address plaintiffs' claims in one Memorandum

Opinion.

At the heart of this dispute are the regulations in 49 C.F.R. Part 604, known as the "Charter Rule," which was designed to effectuate the goal of 49 U.S.C. § 5323(d) of preventing local governmental authorities that receive federal transportation financial assistance from providing charter bus service if a private charter operator is willing and able to provide such service. Plaintiffs request that the Court declare unconstitutional section 172 of the Consolidated Appropriations Act of 2010 ("Appropriations Act"), Pub. L. No. 111-117, § 172, 123 Stat. 3034, 3065-66 (Dec. 16, 2009), also known as the "Murray Amendment," because it singles out Washington state's King County Department of Transportation Metro Transit Division ("KCM") as the sole federally funded transit agency against whom FTA may not enforce the Charter Rule, to the detriment of private charter operators in the King County area.

This matter initially came before the Court on plaintiffs' applications for a preliminary injunction, but the Court subsequently consolidated the applications hearing with a trial on the merits, which was conducted on June 3, 2010. (*See* Order, May 14, 2010.) Based on the entire record, the arguments of counsel at the hearing on June 3, and the relevant law, and for the reasons discussed herein, the Court will grant judgment in favor of plaintiffs and issue the requested relief.

## BACKGROUND

American Bus Association ("ABA") and United Motorcoach Association ("UMA"), both organized as not-for-profit corporations, are national trade associations representing the charter bus industry. (ABA Compl. ¶ 3; UMA Compl. ¶ 3.) Plaintiffs' members are private entities that provide passenger services, including charter bus service. A number of these members provide charter bus service between various states and within King County, Washington, which includes

the city of Seattle. (ABA Compl. ¶ 4; UMA Compl. ¶ 4.) One such member of both ABA and

UMA is Starline Luxury Coaches, a division of Transportation Demand Management, Inc.,

which does business as Starline Transportation (collectively "Starline"). (UMA's Reply in Supp.

of Mot. for Prelim. Inj. ("UMA Reply"), Ex. B ("Gillis Aff.") ¶ 2; *see also* UMA's Mem. of P. &

A. in Supp. of Mot. for Prelim. Inj. ("UMA Mem."), Ex. A ("Presley Aff.") ¶ 9; ABA's Reply in

Supp. of Mot. for Prelim. Inj. ("ABA Reply"), Suppl. Aff. Of Peter Pantuso ("2nd Pantuso Aff.")

¶ 5.) According to Starline's chief executive officer, Gladys Gillis, Starline is "a woman-owned

State of Washington Corporation engaged in transportation services in the Puget Sound Region,

including charter service," and it is "the largest privately owned and operated motorcoach carrier

in Seattle." (Gillis Aff. ¶¶ 2, 4.)

## I.      THE ADMINISTRATIVE SCHEME

Under the Federal Transit Act, 49 U.S.C. §§ 5301-5540, the FTA Administrator oversees

the federal government's funding of state and local public transportation systems throughout the

United States, including charter services. *See generally* 49 U.S.C. § 5301(f); 49 C.F.R. §§ 1.45,

1.51 (delegating authority to the FTA Administrator). Under the regulatory scheme, "recipients"

are entities receiving FTA-distributed federal funds, whether directly or indirectly as

"subrecipients." 49 C.F.R. § 604.3(r). "Charter service" is defined as including (1)

"[t]ransportation provided by a recipient at the request of a third party for the exclusive use of a

bus or van for a negotiated price" and (2) "[t]ransportation provided by a recipient to the public

for events or functions that occur on an irregular basis or for a limited duration" and either a

premium fare is charged or a third party pays in whole or in part for the service. *Id.* § 604.3(c).

It is undisputed that at all relevant times, KCM has been a transit service operated by the State of

Washington, that it has received financial assistance from the FTA, and that it has provided

"charter service" as defined by FTA regulations.

In order to ensure that state or local governments do not use federal funds "to foreclose a private operator from providing intercity charter bus service if the private operator can provide the service," a recipient that is a governmental authority (or an entity operating public transportation on that authority's behalf) cannot "provide charter bus transportation service outside the urban area in which it provides regularly scheduled public transportation service." 49 U.S.C. § 5323(d)(1). This serves to "protect[] private charter operators from unauthorized competition from recipients of Federal financial assistance . . . ." 49 C.F.R. § 604.1(a) (implementing 49 U.S.C. § 5323(d)).

The Charter Rule, 49 C.F.R. §§ 604.1-604.50, sets forth the comprehensive protections given to private charter operators.[1] One such protection is the requirement that recipients enter a "Charter Service Agreement" as a condition of receiving FTA funds for the acquisition or operation of public transportation equipment or facilities. *See* 49 C.F.R. § 604.4(a). Under that agreement,

> [t]he recipient agrees that it, and each of its subrecipients, and third party
> contractors at any level who use FTA-funded vehicles, may provide charter
> service using equipment or facilities acquired with Federal assistance authorized
> under the Federal Transit Laws only in compliance with the regulations set out in
> 49 CFR 604, the terms and conditions of which are incorporated herein by
> reference.

*Id.* § 604.4(b); *see also* 49 U.S.C. § 5323(d)(1).

The Charter Rule permits "interested part[ies]" to "request an advisory opinion from the [FTA's] Chief Counsel on a matter regarding specific factual events only." 49 C.F.R. §

---

[1] Part 604 was promulgated in its current form in 2008, partly in response to recommendations made by an advisory committee consisting of representatives of charter bus companies, public transportation agencies that receive FTA funds, and other interested parties. *See* 73 Fed. Reg. 2326, 2328 (Jan. 14, 2008).

604.18(a).  An "[i]nterested party" can be a "corporation, *association*, or other organization that has a financial interest that is affected by the actions of a recipient providing charter service under the Federal Transit Laws."  *Id.* § 604.3(l) (emphasis added).  "An advisory opinion represents the formal position of FTA on a matter" and, with an exception not relevant here, "obligates the agency to follow it until it is amended or revoked."  *Id.* § 604.20(a).  An opinion can be used in administrative or judicial proceedings "to illustrate acceptable and unacceptable procedures or standards, but not as a legal requirement . . . ."  *Id.* § 604.20(b).  A request for an advisory opinion may also include a request that the Chief Counsel issue a cease-and-desist order, "which would be an order to refrain from doing an act which, if done, would be a violation of" the Charter Rule.  *Id.* § 604.17.  Such an order would be directed at a recipient whose provision of charter service violates the Charter Rule and "is likely" to cause the interested party to lose business opportunities and thus harm "the public interest."  *See id.* § 604.22(a)(1).  The Chief Counsel must "make every effort to respond to a [valid] request for an advisory opinion within ten days of receipt . . . ."  *Id.* § 604.19(b).

In addition, if the agency receives a formal complaint that the charter agreement set forth in the Charter Rule has been violated, it "shall investigate and decide whether a violation has occurred."  49 U.S.C. § 5323(d)(2)(A).  The agency "shall correct" any violation of the agreement's terms that it determines to have occurred.  *Id.* § 5323(d)(2)(B).  A private charter operator can become a "registered charter provider" in order to acquire "standing" to file such a formal complaint challenging a recipient's violation of the Charter Rule.  *Id.* § 604.13(b).[2]  Once

---

[2] To register, the operator must provide various information through an FTA website, including "[t]he geographic service areas of public transit agencies, as identified by the transit agency's zip code, in which the private charter operator intends to provide charter service . . . ."  *Id.* § 604.13(a)(3); *see also id.* § 604.25.  Such registration also demonstrates that the private operator "wishes to receive notification of pending charter service requests directed to federally funded public transit agencies . . . ."  *Id.* § 604.3(s).  When a recipient receives a request for

registered, a private charter operator that is "affected by" a recipient's "alleged noncompliance" with the Charter Rule "may file a complaint" with the FTA's Office of Chief Counsel. *Id.* § 604.27(a). The complaint must specify, *inter alia*, how the private operator was "directly and substantially affected by the things done or omitted by the recipients . . . ." *Id.* § 604.27(b)(4).[3] The recipient must answer a valid complaint within 30 days of being notified of its docketing, after which the complaining operator may file a reply, to which the recipient may file a rebuttal. *See id.* § 604.27(c)-(e). If the submissions and supporting documentation establish "a reasonable basis for investigation," the FTA "shall investigate the subject matter of the complaint." 49 C.F.R. § 604.32(a).[4]

The FTA's investigation into a complaint may include a review of the written submissions, further informal investigation by FTA, and review of any additional information furnished by the parties at the FTA's request. 49 C.F.R. § 604.32(b). No later than 90 days after receiving the last pleading, the FTA shall notify the parties of the investigation's completion, *id.* § 604.32(c), and then either issue a decision based on the pleadings, appoint a Presiding Official ("PO"), or dismiss the complaint. *Id.* § 604.34(a). If a PO is appointed, the Chief Counsel must issue a hearing order that sets forth, *inter alia*, the issues to be decided, the relevant legal

---

charter service, it may "[d]ecline to provide the service," "[p]rovide the service under an exception" to the Charter Rule, or email the registered private operators to notify them that the recipient will provide the service itself. *Id.* § 604.14(a). Under this third option, a recipient may only provide the service if no registered private operator responds to express its interest in doing so. *See id.* § 604.9(a)-(b).

[3] This requirement that a complainant be "directly" affected by a recipient's actions or inactions suggests that private operators may only complain about recipients who operate within the same geographic service area, which is "the entire area in which a recipient is authorized to provide public transportation service under appropriate local, state, and Federal law." 49 C.F.R. § 604.3(j); *see also supra* note 2.

[4] The FTA may also "initiate its own investigation" of a violation of the Charter Rule "without having received a complaint." 49 C.F.R. § 604.33(a).

authorities, any necessary supplemental rules of procedure not specified in the Charter Rule, and the deadline for the PO's recommendation. *Id.* § 604.32(b)(2)-(6).

The PO presides over a public hearing subject to a variety of procedural protections.[5] The private charter operator bears the burden of proof by a preponderance of the evidence to show that the recipient has not complied with the Charter Rule. 49 C.F.R. §§ 604.41, 604.42. Following the hearing, the PO "shall issue a recommended decision" based on the record, and the Chief Counsel has 30 days to ratify or modify the decision. *Id.* § 604.46; *see* § 604.44. If the Chief Counsel determines that the Charter Rule has been violated, he or she may bar the recipient from receiving future FTA funds, order the partial withholding of FTA funds from the recipient, or seek suspension and debarment of the recipient or its agents. *Id.* § 604.47(a). The type and amount of the remedy are to be determined in light of, *inter alia*, the nature and circumstances of the violation, the extent and gravity of the violation, and the revenue earned by providing the charter service. *See id.* § 604.47(b).

A party may appeal the Chief Counsel's decision to the FTA Administrator, who reviews the record (including the parties' appellate submissions, if any) and issues a final agency decision that accepts, rejects, or modifies the decision.[6] 49 C.F.R. § 604.48(a)-(b). A petition for judicial review under the Administrative Procedure Act ("APA") may be filed "in an

---

[5] The PO has the power to hold pre-hearing conferences, settlement discussions, and public hearings; administer oaths and affirmations; limit the scope of discovery, issue deposition notices, receive evidence, and examine witnesses; decide procedural motions; and make findings of fact and conclusions of law. 49 C.F.R. § 604.36(a)-(k); *id.* § 604.40(a) (hearings must be public). The parties have a right to "appear and be heard in person," whether *pro se* or represented by counsel, and to conduct discovery and take depositions. *Id.* §§ 604.37(a), 604.38, 604.39.

[6] If no appeal is taken from the Chief Counsel's decision, and the Administrator does not initiate a review on his or her own motion, *see* 49 C.F.R. § 604.49, the Chief Counsel's decision becomes the final agency decision for which the right to judicial review is deemed to have been waived. *Id.* § 604.48(c)-(d).

appropriate United States District Court" within 60 days of the effective date of the Administrator's order. *Id.* § 604.50(a).

## II.    THE PRIOR LITIGATION

This Court previously considered a challenge by UMA to the FTA's non-enforcement of the Charter Rule against KCM, which was dismissed as moot. *See United Motorcoach Ass'n, Inc. v. Welbes* ("*UMA I*"), 614 F. Supp. 2d 1 (D.D.C.), *aff'd*, No. 09-5211, 2009 WL 5125173 (Dec. 9, 2009), *reh'g en banc denied* (Mar. 24, 2010). The following factual background is taken from that prior opinion in order to provide a more complete understanding of the present dispute. *See* 614 F. Supp. 2d at 3-7.

For many years, KCM provided public transit service for fans of the Seattle Mariners baseball team who wished to ride between the Mariners' home games and various points around Seattle. Prior to the Charter Rule's promulgation in 2008, such a public transit service was not considered "charter service."[7] However, following the Charter Rule's promulgation, KCM's Mariners service fell under the regulatory definition of "charter service." Thus, effective April 30, 2008, KCM could no longer provide this transportation service if a registered private operator expressed interest in providing the same service, *see* 49 C.F.R. § 604.9(b), unless KCM petitioned the FTA Administrator for an exception to the Charter Rule. *See id.* § 604.11(a). The three primary grounds for exceptions are for (1) events of regional or national significance; (2) hardship (only for non-urbanized areas under 50,000 in population or small urbanized areas under 200,000 in population); or (3) unique and time sensitive events (*e.g.*, funerals of local,

---

[7] Previously, "charter service" had been defined to include "transportation using buses . . . of a group of persons who pursuant to a common purpose, under a single contract, at a fixed charge . . . have acquired the exclusive use of the vehicle or service to travel together under an itinerary . . . ." 52 Fed. Reg. 11916, 11933 (Apr. 13, 1987) (previously codified at 49 C.F.R. § 604.5(e) (1987)).

regional, or national significance) that are in the public's interest.[8] *Id.*

In March 2008, KCM petitioned the Administrator for a Charter Rule exception that would allow it to provide services for the entire 2008 Mariners baseball season as a unique and time sensitive event, or, alternatively, for a 90-day exception to allow for a transition period during which the Mariners and any interested private operators could negotiate and implement a replacement service. In April the Administrator denied KCM's petition on the ground that Mariners games were not unique and time sensitive events, but he gave KCM a 60-day exception to consult with private charter operators. Starline expressed interest in providing the charter service for the remainder of the Mariners' 2008 season, but Starline and the Mariners were unable to reach a final agreement. In June, KCM filed another petition for a Charter Rule exception for the remainder of the season, citing its good faith but unsuccessful efforts to facilitate the establishment of private replacement service. That same month, the Administrator granted KCM's petition for an exception for the remainder of the Mariners' season as a unique and time sensitive need, while strongly urging KCM to work with Starline to serve the public's transportation needs in a manner consistent with federal regulations.

On September 26, 2008, two days before the end of the Mariners' season, UMA filed suit challenging the Administrator's June 2008 exception to KCM as unlawful under the APA, 5 U.S.C. § 706(2)(A). Following the season's end, the Administrator moved to dismiss for lack of subject matter jurisdiction, arguing that because KCM's exception had expired, UMA's action was moot and any argument regarding the future was not ripe. This Court agreed and dismissed UMA's complaint as moot, citing the expiration of the Administrator's grant of an exception,

---

[8] A recipient may also provide charter service "consistent with an agreement entered into with all registered charter providers in the recipient's geographic service area." 49 C.F.R. § 604.10.

614 F. Supp. 2d at 9, and unripe as applied to future violations of the Charter Rule, because UMA's suggestion of future harm "rest[ed] upon contingent future events that may not occur as anticipated or may not occur at all."  *Id.* at 11 (internal quotation marks omitted).  Following the Court's ruling in *UMA I*, neither KCM nor Starline provided bus service to Mariners games during the 2009 baseball season.  (See Trial Tr. ("Tr.") at 28-29.)

## III.    THE MURRAY AMENDMENT

On December 16, 2009, President Obama signed the Appropriations Act into law, thereby providing funding for DOT and other agencies for 2010.  Section 172 of the Act, referred to as the Murray Amendment after its sponsor, U.S. Senator Patty Murray of Washington, provides:

> None of the funds provided or limited under this Act may be used to enforce regulations related to charter bus service under part 604 of title 49, Code of Federal Regulations, for any transit agency who during fiscal year 2008 was both initially granted a 60-day period to come into compliance with part 604, and then was subsequently granted an exception from said part.

123 Stat. at 3065-66.  It is undisputed that KCM is the only transit agency in the nation that meets this description.[9]  (*See* Tr. at 19.)  It is also undisputed that the Murray Amendment prohibits defendants from enforcing the Charter Rule against KCM, such as by issuing cease-and-desist orders, processing formal complaints, and enforcing advisory opinions.  (*See* Tr. at 4-7.)

## IV.    THE INSTANT LITIGATION

On February 24, 2010, Starline communicated to the Mariners that it was "willing and able to provide the charter service" for the 2010 season.  (Gillis Aff. ¶ 12.)  However, the

---

[9] Plaintiffs also allege that KCM lobbied for the Murray Amendment's enactment (UMA Compl. ¶ 41), and that Congress intended that KCM be the Amendment's subject and beneficiary.  (ABA Compl. ¶ 50.)

Mariners "refused to consider" Starline.  (*Id.* ¶ 14.)[10]  On March 29, Starline's CEO "first became aware" that KCM "was intending to provide charter services to the 2010 Seattle Mariners'[] home baseball games and other sporting and special events in the Seattle metropolitan area."  (*Id.* ¶ 7).

Since April 2010, KCM has been operating charter bus service for weekend Mariners home games, between the team's stadium and four park-and-ride locations, and for weekend soccer matches of the Seattle Sounders Football Club, as well as other special events in the city. (Gillis Aff. ¶ 8.)  On April 6, plaintiffs wrote to KCM and requested that it cease and desist operation of its Mariners charter service, on the ground that it violates the Charter Rule by "tak[ing] away valuable business opportunities for a number of private bus operators in the King County area who are ready, willing[,] and able to provide the service."  (*See* UMA Mem., Ex. A-5 at 1.)  On April 14, KCM responded that its charter service is lawful, because the Murray Amendment "was adopted to allow Metro and other transit agencies meeting the criteria in the legislation to provide this type of service."  (*Id.*, Ex. A-6 at 1.)

ABA and UMA filed their complaints in the instant actions on May 3 and 4, 2010, respectively, alleging infringements of their First Amendment right to petition Congress for redress of grievances, of their Fifth Amendment rights to procedural due process and to equal protection, and of the constitutional "guarantee" of the separation of powers.[11]  On May 11 and 17, respectively, ABA and UMA moved for preliminary injunctions, which the Court ordered for consolidation with a trial on the merits.  (*See* Order, May 14, 2010.)

---

[10] During 2008 and 2009, Starline provided charter service for the Seattle Seahawks football team's home games.  (Gillis Aff. ¶¶ 13.)  According to Starline, it "was able to provide this service while accommodating all [Americans with Disabilities Act] requirements."  (*Id.*)

[11] UMA's case was initially assigned to another judge of this Court but was transferred to the undersigned on May 11, 2010, as related to ABA's complaint.

On May 14, 2010, UMA submitted an "Advisory Opinion & Cease and Desist Request" to the FTA Chief Counsel on Starline's behalf, pursuant to 49 C.F.R. § 604.18. (*See id.*, Ex. A-1 at 1.) The request sought an advisory opinion on (1) the legality of KCM's activities, (2) the FTA's ability to receive complaints about KCM, and (3) the FTA's ability to issue a cease-and-desist order against KCM notwithstanding the Murray Amendment. (*See id.* ¶ 1.) The request also sought a cease-and-desist order on the ground that Starline and its employees have been "denied a valuable business opportunity and are significantly harmed financially" by KCM's violation of the Charter Rule, despite Starline's previous good faith negotiations with the Mariners and its submissions of multiple proposals for a private charter service. (*Id.* ¶ 5.) On May 27, KCM wrote to defendants to request that no action be taken on these requests until the resolution of the instant litigation. (*See* No. 10-CV-701, Def.'s Notice of Filing, June 3, 2010.) To date, defendants have not responded to UMA and Starline's requests.

## ANALYSIS

### I.     STANDING

Defendants begin their opposition by challenging ABA and UMA's standing to bring suit. (Defs.' Mem. of P. & A. in Opp'n to Pls.' Mots. For Prelim. Inj. ("Opp'n") at 7-13.) Unpersuaded by defendants' arguments, the Court concludes that both plaintiffs have standing.

#### A.     Legal Principles

"Article III of the Constitution confines the federal courts to adjudicating actual 'cases' and 'controversies.'" *Allen v. Wright*, 468 U.S. 737, 750 (1984); *see* U.S. Const. art. III, § 2. "[T]he core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). To meet the requirements for Article III standing, a plaintiff bears the burden of showing

(1) that it has suffered an "injury in fact" (*i.e.,* "an invasion of a legally protected interest") that is both (i) "concrete and particularized" and (ii) "actual or imminent, not conjectural or hypothetical"; (2) that there is "a causal connection" between the alleged injury and the conduct underlying the claim, such that the injury is "fairly traceable" to the defendant's challenged action and does not result from "the independent action of some third party not before the court"; and (3) that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *See id.* at 560-61 (edits, ellipses, and internal quotation marks omitted). "These requirements together constitute the 'irreducible constitutional minimum' of standing . . . ." *Vt. Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 771 (2000) (quoting *Lujan*, 504 U.S. at 560). In addition, an associational plaintiff that seeks to sue on behalf of its members "must demonstrate that (1) at least one of its members would have standing to sue in his own right, (2) the interests the association seeks to protect are germane to its purpose, and (3) neither the claim asserted nor the relief requested requires that an individual member of the association participate in the lawsuit." *Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930, 937 (D.C. Cir. 2004) (citing *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)).

Because the government's contentions regarding plaintiffs' lack of standing constitute a direct challenge to the Court's subject matter jurisdiction, the Court will construe the government's arguments as a motion to dismiss the complaints for lack of jurisdiction.[12] "For

---

[12] UMA refers to the issue of whether it has standing as a question of "justiciability." (*See* UMA Reply at 3, 7.) However, "justiciability" is not the same as "standing," because a dismissal for lack of standing would be based on the Court's lack of subject matter jurisdiction over a plaintiff's claims, while a dismissal for nonjusticiability would be based on a plaintiff's failure to state a claim for which any judicially crafted relief would be available or appropriate. *See Baker v. Carr*, 369 U.S. 186, 198 (1962) ("The distinction between the two grounds is significant. In the instance of nonjusticiability, consideration of the cause is not wholly and immediately foreclosed; rather, the Court's inquiry necessarily proceeds to the point of deciding

purposes of ruling on a motion to dismiss for want of standing," the Court "must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Warth v. Seldin*, 422 U.S. 490, 501 (1975). The Court may also "consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Coal. for Underground Expansion v. Mineta*, 333 F.3d 193, 198 (D.C. Cir. 2003) (internal quotation marks omitted). "If, after this opportunity, the plaintiff's standing does not adequately appear from all materials of record, the complaint must be dismissed." *Warth*, 422 U.S. at 501-02.

### B. Plaintiffs Have Associational Standing

The evidence shows that plaintiffs have associational standing because at least one of their members, Starline, has suffered an injury-in-fact that is traceable to defendants' conduct and which would be redressed by the invalidation of the Murray Amendment.[13] *See, e.g.*, *Emergency Coal. to Defend Educ. Travel v. U.S. Dep't of Treasury* ("*ECDET*"), 545 F.3d 4, 9-11 (D.C. Cir. 2008) (satisfying standing inquiry by finding that association's chairman had standing), *aff'g* 498 F. Supp. 2d 150 (D.D.C. 2007); *Forum for Academic & Inst'l Rights, Inc. v. Rumsfeld*, 291 F. Supp. 2d 269, 288-89 (D.N.J. 2003) (holding that association of law schools had standing to challenge statute under First Amendment where some individual member schools suffered injuries-in-fact traceable to statute), *aff'd on standing but rev'd on merits*, 390 F.3d 219,

---

whether the duty asserted can be judicially identified and its breach judicially determined, and whether protection for the right asserted can be judicially molded."); *Oryszak v. Sullivan*, 576 F.3d 522, 526 n.3 (D.C. Cir. 2009) ("That a particular dispute is nonjusticiable . . . does not mean the court lacks jurisdiction over the subject matter").

[13] Defendants do not, nor could they, dispute the other requirements for associational standing, namely that the interests that plaintiffs seek to protect are "germane to [their] purpose[s]" as trade associations representing the charter bus industries, and that plaintiffs' claims and requested relief do not require Starline's participation in this lawsuit. *Nat'l Wrestling Coaches*, 366 F.3d at 937. The Court also notes that Starline's CEO, who sits on UMA's board of directors (Gillis Aff. ¶ 3), has submitted an affidavit in support of UMA's reply brief.

228 n.7 (3d Cir. 2004), *aff'd on standing but rev'd on merits*, 547 U.S. 47, 52 n.2 (2006).

Plaintiffs characterize Starline's injury-in-fact as "the deprivation of constitutional rights engendered by the 'Murray Amendment.'" (UMA Reply at 4.) Specifically, they contend that Starline's First and Fifth Amendment rights have been violated because the Murray Amendment prohibits defendants from enforcing the Charter Rule against KCM, which deprives Starline of the ability to administratively petition defendants in order to challenge KCM's alleged violations of the Rule. The Article III standing analysis requires the Court to "assume that the [Murray] [A]mendment[] ha[s] the legal significance" that plaintiffs assert. *ECDET*, 545 F.3d at 10. Thus, the asserted invasion of Starline's constitutionally protected interests is sufficient to establish an injury-in-fact.[14] *See, e.g.*, *A.N.S.W.E.R. Coal. v. Kempthorne*, 493 F. Supp. 2d 34, 45 (D.D.C. 2007) (finding injury-in-fact where plaintiff organization alleged invasion of asserted First Amendment rights); *Flynt v. Rumsfeld*, 355 F.3d 697, 702 (D.C. Cir. 2004) (finding injury-in-fact where plaintiffs "asked for immediate access to accompany U.S. troops in combat, which they contend is their constitutional right, and that access was not granted").[15]

Causality and redressability also cannot be disputed. Defendants control the Charter Rule's administrative challenge procedures, so they directly cause Starline's asserted injuries because they will not spend funds to issue cease-and-desist orders or process complaints against

---

[14] The government incorrectly argued in its briefing that plaintiffs' injury-in-fact must take the form of economic harm. (*See* Defs.' Mem. at 11-12 (criticizing ABA's supposed failure to tie "alleged lost revenue to King County Metro's services").)

[15] The record also shows that Starline's injury is concrete and imminent, as there is ample evidence of Starline's past and present efforts to avail itself of the FTA's administrative mechanisms, as well as of its ongoing desire and efforts to provide the charter services currently provided by KCM. This evidence "elevate[s] [plaintiffs'] claims beyond the realm of hypothetical intentions and suffice to support a finding of injury-in-fact." *ECDET*, 498 F. Supp. 2d at 158; *see also ECDET*, 545 F.3d at 10 (finding that "consistent annual repetition of" plaintiff's academic program "over several years culminating in concrete plans for the content and focus of the 2005 program are plainly far more concrete and specific than mere 'some day' intentions").

KCM. Moreover, it cannot be disputed that but for the Murray Amendment, the FTA would be required to enforce the Charter Rule.[16] Therefore, a declaratory judgment that the Amendment is unconstitutional would permit defendants to entertain Starline's administrative challenges to KCM's actions.

In sum, the Court finds that Starline has standing in its own right to bring this suit. Accordingly, both plaintiffs have associational standing to do so as well.[17]

## II.  CONSTITUTIONALITY OF THE MURRAY AMENDMENT

### A.  Standard of Review

The government's central argument in response to plaintiffs' constitutional challenges is that the Murray Amendment is an economic regulation that is entitled to no more than rational

---

[16] It is clear that absent the Murray Amendment, Starline would be able to avail itself of these administrative processes. It is an "interested party" that may seek an advisory opinion or a cease-and-desist order from the FTA's Chief Counsel, 49 C.F.R. § 604.18(a), because the record shows that it has "a financial interest that is affected" by KCM's provision of charter services. *Id.* § 604.3(l). (*See, e.g.*, Gillis Aff. ¶ 16 (noting Starline's 2008 purchase of over two million dollars' worth of vehicles "[i]n anticipation of . . . being the provider for some or all of [the] charter work" that KCM currently provides).) Starline is also a "registered charter operator" for the Seattle area and has regulatory standing to file a complaint challenging KCM's alleged Charter Rule violations. 49 C.F.R. § 604.13(b).

[17] In the alternative, the Court concludes that UMA has organizational standing to bring its claims. "In order for [UMA] to assert standing to challenge [the Murray Amendment] on its own behalf, it must meet the general standing requirements applied to individuals." *Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1433 (D.C. Cir. 1995). To allege that the *organization* has suffered an injury-in-fact, UMA must show "that discrete programmatic concerns are being directly and adversely affected" by the Murray Amendment. *Id.* (internal quotation marks omitted). Not only do UMA's general purposes include "protecting the rights of its members in court" and "assist[ing] in promoting beneficial and remedial laws" (UMA Compl. ¶ 5), but UMA has spent the last several years participating firsthand in the Charter Rule enforcement process *on Starline's behalf*, such as through the 2008 administrative complaint against KCM and subsequent litigation in *UMA I*, as well as through UMA's recent request for a cease-and-desist order against KCM. Because defendants' reliance upon the Murray Amendment "'perceptibly impair[s]' [UMA's] ability to carry out its activities," *Friends of Animals v. Salazar*, 626 F. Supp. 2d 102, 113 (D.D.C. 2009) (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)), defendants' conduct injures UMA just as concretely and imminently as it injures Starline.

basis review. (Opp'n at 30-33.) Although the parties agree that the Amendment creates distinctions between plaintiffs and other similarly situated entities,[18] thus implicating equal protection analysis, *see News Am. Pub'g, Inc. v. F.C.C.*, 844 F.2d 800, 804 (D.C. Cir. 1988) (equal protection requires government to "afford similar treatment to similarly situated persons"), that analysis ends, according to defendants, if and when the Court finds that the statute is rationally related to some legitimate government purpose. (*See* Opp'n at 32-33.) At oral argument, counsel for the government conceded that if the standard of review were something more exacting than the rational basis test, the Amendment was not likely to withstand scrutiny. (*See* Tr. at 13 ("I would say if there is not a rational basis test across the board, I think I probably would have a problem.").) But because defendants maintain that the statute implicates nothing more than the competing economic interests of plaintiffs and other entities, they argue that it need not pass such heightened examination.

The problem with defendants' position is that in addition to their equal protection claims, plaintiffs allege that the Murray Amendment significantly burdens their First Amendment right to petition. "The First Amendment guarantees 'the right of the people . . . to petition the Government for a redress of grievances.'" *McDonald v. Smith*, 472 U.S. 479, 482 (1985) (quoting U.S. Const. amend I). "[T]he right to petition extends to all departments of the Government," including "administrative agencies (which are both creatures of the legislature, and arms of the executive) and . . . courts, the third branch of Government." *Cal. Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972); *accord Bill Johnson's*

---

[18] According to the FTA's website, 13 private operators based in Washington have registered as providing charter service with starting and ending locations in Seattle; 98 operators based in other states have also registered as providing some degree of charter service within Seattle. *See* U.S. Dep't of Transportation, FTA Charter Registration: Private Charter Operator Registration Search, *at* http://ftawebprod.fta.dot.gov/CharterRegistration (last visited June 9, 2010).

*Restaurants, Inc. v. N.L.R.B.*, 461 U.S. 731, 741 (1983).[19]  "The government is prohibited from infringing upon th[is] guarantee[] either by a general prohibition against certain forms of advocacy, or by imposing sanctions for the expression of particular views it opposes."  *Smith v. Ark. State Highway Employees, Local 1315*, 441 U.S. 463, 465 (1979) (internal citations omitted).  Plaintiffs argue that the Murray Amendment deprives them of the ability to invoke the established mechanism by which privately-owned charter bus operators may challenge unlawful competition from publicly-subsidized KCM.  (*See* ABA Mem. at 18-19; UMA Mem. at 15.)  Because it prevents the FTA from spending money to review, investigate, or hear complaints against KCM, plaintiffs contend that the Amendment effectively denies them access to the administrative process and to the courts under the APA.  (*See* UMA Mem. at 15-16).  And, as plaintiffs argue, this constitutes a significant burden on their First Amendment right to petition.

Defendants concede that the Amendment prohibits the FTA from enforcing any aspect of the Charter Rule against KCM, meaning that the agency may not consider complaints filed against KCM or issue cease-and-desist orders to it, as provided by 49 C.F.R. § 604.23.  (*See* Tr. at 4-7.)  And, the administrative complaint process outlined in the Charter Rule is the only avenue available for private charter bus companies affected by publicly-subsidized competition to enforce their rights under the Charter Rule.  *See Blue Bird Coach Lines v. Linton*, 48 F. Supp. 2d 47, 49-50 (D.D.C. 1999) ("[t]he FTA Act does not create a private right of action," but prior

---

[19] In *California Motor Transport* and *Bill Johnson's Restaurants*, the Court applied the *Noerr-Pennington* doctrine, which is based on two cases that "stand for the proposition that when a person petitions the government for redress, the First Amendment prohibits any sanction on that action – for instance, a Sherman Act penalty for anticompetitive behavior – so long as the petition was in good faith."  *Nader v. Democratic Nat. Comm.*, 567 F.3d 692, 696 (D.C. Cir. 2009); *see generally E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961); *United Mine Workers v. Pennington*, 381 U.S. 657 (1965).  Thus, as the D.C. Circuit has explained, the *Noerr-Pennington* doctrine necessarily "rests on the conclusion that the filing of claims in court or before administrative agencies is part of the protected right to petition . . . ."  *Whelan v. Abell*, 48 F.3d 1247, 1254 (D.C. Cir. 1995).

version of 49 C.F.R. § 604.50 permitted, through the APA, judicial review of administrator's

decision on complaints).[20]  Absent access to the procedures in section 604, the door has been

shut to both the agency and the courts.[21]  (*See* Tr. at 15 (The Court: "Effectively, the

---

[20] At oral argument, defendants speculated that even under the Murray Amendment, the FTA could issue an advisory opinion stating its position on whether KCM had violated the Charter Rule but also noting its inability to enforce that position through a cease-and-desist order.  (*See* Tr. at 6-7.)  Defendants suggested that such an advisory opinion would nonetheless constitute a "final" agency decision subject to judicial review under the APA, giving plaintiffs *some* access to judicial review of Charter Rule violations.  However, the Amendment prohibits the FTA from spending any funds "to enforce regulations related to charter bus service under part 604 of title 49" as to KCM, 123 Stat. at 3065-66, so the plain language of the statute arguably precludes funding even for the formulation or issuance of an advisory opinion under 49 C.F.R. § 604.19.  In addition, the Charter Rule limits judicial review under the Rule to the FTA Administrator's "final decision *and order*" on a *complaint* once that decision and order are effective.  *See* 49 C.F.R. § 604.50 (emphasis added).

Moreover, an advisory opinion from the FTA can only "be used in administrative or judicial proceedings to illustrate acceptable and unacceptable procedures or standards," and cannot be used "as a legal requirement."  49 C.F.R. § 604.20(b).  As "nothing more than [a] general policy statement with no legal force" that "merely expresses [the agency's] view of what the law requires of a party," an advisory opinion would not be reviewable final agency action within the meaning of the APA.  *Center for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 452 F.3d 798, 808 (D.C. Cir. 2006) (internal quotation marks omitted); *cf. Unity08 v. F.E.C.*, 596 F.3d 861, 865 (D.C. Cir. 2009) (FEC advisory opinion adverse to plaintiff was reviewable final agency action where plaintiff was deprived of legal right conferred by statute, "which [plaintiff] would [have] enjoy[ed] if it had obtained a favorable resolution in the advisory opinion process").

Finally, under the Murray Amendment, it is entirely unclear what relief plaintiffs might obtain through judicial review of an advisory opinion.  Even if a court believed KCM to be in violation of the Charter Rule, given the plain language of the Amendment, it could not order the FTA to enforce the Rule.  Such meaningless judicial review, if it were even possible, would fail to satisfy plaintiffs' right to petition.

[21] Defendants correctly note that the First Amendment does not "impose any affirmative obligation on the government to listen, [or] to respond" to a petition.  *Smith*, 441 U.S. at 465; *see also We the People Found., Inc. v. United States*, 485 F.3d 140, 141 (D.C. Cir. 2007) (rejecting argument that "First Amendment guarantees a citizen's right to receive a government response to or official consideration of a petition for redress of grievances").  But as counsel for defendants seemed to acknowledge at oral argument (*see* Tr. at 55-56), this case is distinguishable from *We the People*, where plaintiffs freely petitioned multiple government officials on a number of subjects but felt that they had not received an adequate response from those officials.  Nor are the instant plaintiffs akin to the plaintiffs in *Smith*, where a union and its members made "no claim of . . . discrimination proscribed by the First Amendment," but rather claimed only that their state

administrative process is cut off, right?"  Defense Counsel: "Yes.").)  As such, the Amendment is a *de facto* "general prohibition against certain forms of advocacy," *Smith*, 441 U.S. at 465, because it precludes plaintiffs from using prescribed procedures to enforce their rights under the Charter Rule against KCM.  *Cf. Cal. Motor Transp.*, 404 U.S. at 515 ("any carrier has the right of access to agencies and courts, within the limits, of course, *of their prescribed procedures,* in order to defeat applications of its competitors for certificates as highway carriers" (emphasis added)).

In response, defendants contend that the right to petition only extends so far as there is a cause of action and that with the Murray Amendment, Congress limited plaintiffs' cause of action under the Charter Rule.  This argument is unavailing.  The Charter Rule remains in effect, providing plaintiffs and all other registered private charter operators a cause of action to seek redress for illegal competition from publicly-subsidized local transit providers.   Moreover, KCM remains subject to the Rule, although the FTA lacks funding to enforce it with respect to only this one entity.[22]  But plaintiffs are shut out of the only process by which they can seek to enforce their rights under the Charter Rule, meaning that plaintiffs have a right to petition but are effectively prevented from doing so with respect to only one entity – KCM.  Such a prohibition

_____

employer "refuse[d] to consider or act upon grievances when filed by the union rather than by the employee directly."  441 U.S. at 465.  Here, Congress and the FTA have established an administrative process that private charter bus operators *must* use in order to seek agency and judicial review, but plaintiffs cannot participate in this process if the subject of their petitions is KCM.

[22] The continued applicability of the Charter Rule to KCM distinguishes this case from *Jung v. Association of American Medical Colleges*, in which Congress passed a law exempting certain organizations involved in graduate medical education from the antitrust laws.  339 F. Supp. 2d 26, 43 (D.D.C. 2004), *aff'd*, 184 F. App'x 9 (D.C. Cir. 2006).  There, Congress explicitly exempted organizations that plaintiffs had sued, thereby eliminating the plaintiffs' cause of action.  *Id.*  Here, by contrast, Congress has prevented the FTA from spending money to enforce the Charter Rule against KCM, but unlike the statute at issue in *Jung*, the Murray Amendment does not eliminate plaintiffs' cause of action.

clearly implicates their First Amendment rights.

Similarly unconvincing is defendants' argument that plaintiffs' right to petition is not burdened by the Murray Amendment because plaintiffs are free to petition the government in other ways, including to petition Congress for a change of the law and to wage a court challenge regarding the constitutionality of the Murray Amendment. (Opp'n at 23.) This argument misses the point, for it fails to address the fact that plaintiffs are prohibited from seeking redress for violations of 49 U.S.C. § 5323(d). The regulatory procedure established to effectuate 49 U.S.C. § 5323(d) – a procedure that was not altered by the Murray Amendment – creates only one method of redress. *See* 49 C.F.R. §§ 604.13-604.50. Regardless of what other ways plaintiffs may exercise their First Amendment rights, their inability to petition on this issue, for which they have a clearly stated cause of action under the regulations, encumbers their First Amendment rights.

Having found that the Murray Amendment burdens plaintiffs' right to petition, the Court must conclude that plaintiffs' claims "lie at the intersection" of the First Amendment and the "Equal Protection Clause's requirement that government afford similar treatment to similarly situated persons." *News Am.*, 844 F.2d at 804; *see, e.g.*, *Ark. Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 228 n.3 (1987) (invalidating, as violation of Press Clause, sales tax regime that taxed general interest magazines but exempted certain other journals, but noting that the First Amendment claims were "obviously intertwined with interests arising under the Equal Protection Clause"); *Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 94-95 (1972) (invalidating, as violation of Equal Protection Clause, anti-picketing law that "treat[ed] some picketing differently from others" because of its subject matter, but noting that "the equal protection claim in this case is closely intertwined with First Amendment interests"); *Niemotko v. Maryland*, 340 U.S. 268,

272 (1951) (invalidating disorderly conduct convictions as violations of "the right to equal protection of the laws" in the exercise of Speech and Free Exercise Clause freedoms). Because this area of First Amendment doctrine (among others) is far from a model of clarity, the Court must first determine what level of scrutiny is appropriate.

When deciding cases solely on First Amendment grounds, courts often require that "a significant impairment of First Amendment rights must survive exacting scrutiny." *Elrod v. Burns*, 427 U.S. 347, 362 (1976) (plurality op.); *see, e.g.*, *Ark. Writers' Project*, 481 U.S. at 231 ("In order to justify [content-based] differential taxation [of certain types of magazines], the State must show that its regulation is necessary to serve a compelling state interest and is narrowly drawn to achieve that end."); *see also SKF USA, Inc. v. U.S. Customs & Border Protection*, 583 F.3d 1340, 1343 (Fed. Cir. 2009) (Linn, J., dissenting from denial of rehearing *en banc*) (arguing, joined by three other judges, that congressional statute imposed "an unconstitutional viewpoint-discriminatory restriction on political speech and petitioning activity that cannot survive strict scrutiny"). Similarly, in cases decided on equal protection grounds, "statutes affecting First Amendment interests [must] be narrowly tailored to their legitimate objectives." *Mosley*, 408 U.S. at 101. But while some of these cases have applied strict scrutiny and required the government to justify a disparate burden upon First Amendment rights by reference to a "compelling" interest,[23] *see, e.g.*, *Williams v. Rhodes*, 393 U.S. 23, 30-34 (1968) (applying compelling interest test to invalidate state balloting law as equal protection violation of, *inter alia*, First Amendment associational rights); *Ruiz v. Hull*, 191 Ariz. 441, 457 (Ariz.

---

[23] As a general matter, strict scrutiny applies to equal protection claims that a statute "interferes with a 'fundamental right' . . . ." *Kadrmas v. Dickinson Pub. Sch.*, 487 U.S. 450, 457-58 (1988); *see, e.g.*, *Attorney General of N.Y. v. Soto-Lopez*, 476 U.S. 898, 906 (1986) (applying "compelling interest" test to claim that state restricted civil service veterans preferences based on applicant's exercise of fundamental right to migrate).

1998) (applying strict scrutiny to invalidate state constitutional amendment requiring government to "act" only in English, as equal protection violation of non-English speakers' First Amendment petition rights), other cases have appeared to apply intermediate scrutiny and merely required that the challenged law further a "substantial" governmental interest. *See, e.g.*, *Mosley*, 408 U.S. at 102.[24] And, in *News America*, the D.C. Circuit suggested a third approach when reviewing a mixed equal protection and First Amendment challenge to Congress' power to direct an agency's implementation of its statutory mandate: something less than strict scrutiny – and possibly less than intermediate scrutiny but greater than rational basis review – would be appropriate. *See* 844 F.2d at 814; *accord Ruggiero v. F.C.C.*, 317 F.3d 239, 244-47 (D.C. Cir. 2003) (*en banc*).[25]

---

[24] Some courts have discussed *Mosley* as applying strict scrutiny, but "*Mosley* "enunciated review standards that were not the most exacting," *Int'l Ass'n of Machinists & Aerospace Workers v. Fed. Election Comm'n*, 678 F.2d 1092, 1106 (D.C. Cir.) (*en banc*), *aff'd*, 459 U.S. 983 (1982) (mem.), and applied the intermediate scrutiny test set forth in *O'Brien v. United States* to invalidate the particular statute at issue. *See Mosley*, 408 U.S. at 102 ("Chicago's ordinance imposes a selective restriction on expressive conduct far 'greater than is essential to the furtherance of (a substantial governmental) interest.'" (quoting *O'Brien*, 391 U.S. 367, 377 (1968) (internal citation omitted)); *see also ECDET*, 545 F.3d at 12 (describing *O'Brien*'s standard as "intermediate scrutiny").

[25] At the motions hearing, defendants suggested that the Murray Amendment was a reasonable regulation of plaintiffs' petition rights because its effects are limited to the 2010 appropriations year and the King County area, and plaintiffs have alternative means of petitioning Congress and the FTA. (*See* Tr. at 20, 22-24.) Defendants' allusions to time and location restrictions and alternative means may have been informed by the First Amendment's "time, place, and manner" doctrines. *See, e.g.*, *Mahoney v. District of Columbia*, 662 F. Supp. 2d 74, at 87 (D.D.C. 2009) ("With respect to any 'as-applied' challenge, it is well settled that the permissible mode of regulating the use of a traditional public forum is summarized under the familiar heading 'time, place and manner.'" (internal quotation marks omitted)). Such doctrines are irrelevant here, because the Murray Amendment singles out the administrative complaints to be ignored "not in terms of time, place, and manner, but in terms of [the] subject matter" of the complaint, *Mosley*, 408 U.S. at 99, namely that KCM has violated the Charter Rule. Second, even if the Murray Amendment were to be treated as a "time, place, and manner" regulation of plaintiffs' First Amendment rights, the government would still be required to justify the restriction as content-neutral and narrowly tailored to serve a significant governmental interest, none of which it has attempted to do. *See Mahoney*, 662 F. Supp. 2d at 87.

The Court finds the Circuit's analysis in *News America* to be compelling in terms of defining the standard of review that controls this case.[26] The challenged government action in *News America* was a 471-page resolution appropriating Federal Communications Commission funding for 1988. 844 F.2d at 801-02. The resolution included a provision, known as the Hollings Amendment, forbidding the use of appropriated funds to extend the duration of "temporary waivers to achieve compliance with" FCC rules regarding cross-ownership of newspaper and broadcasting companies. *Id.* at 802. However, the Amendment was written so as to affect only one entity (*i.e.*, Rupert Murdoch's company). *Id.*; *see also id.* at 814 (noting that "every publisher in the country other than [plaintiff] can knock on the FCC's door and seek the exercise of its discretion to secure" exemptions to restrictions that applied to plaintiff by law). Although the Court acknowledged Congress' ability to enact structural provisions in the heavily regulated field of broadcast communications, *see id.* at 812-13, the Court nonetheless concluded that because the Hollings Amendment burdened only one entity out of hundreds and implicated that entity's First Amendment free speech rights, it must "scrutinize such legislation under a test more stringent than the 'minimum rationality' criterion typically used for conventional economic legislation under equal protection analysis." *Id.* at 802; *see also id.* at 804-05 ("Where

---

[26] In their brief and at oral argument, defendants attempted to distinguish the instant case from *News America* on the grounds that that case dealt with the First Amendment freedoms of speech and of the press, not the right to petition. (*See*, *e.g.*, Opp'n at 31 n.4; Tr. at 9.) But defendants have failed to provide any support for drawing a distinction between the right to petition and other rights guaranteed by the First Amendment. Indeed, "[t]he right to petition is cut from the same cloth as the other guarantees of that Amendment, and is an assurance of a particular freedom of expression." *McDonald*, 472 U.S. at 482. The right to petition, like the right to freedom of speech, is "among the most precious of the liberties safeguarded by the Bill of Rights," *United Mine Workers of Am. v. Ill. State Bar Ass'n*, 389 U.S. 217, 222 (1967), and the Supreme Court has considered "First Amendment rights" as a group, not individually, when discussing applicable protections. *See*, *e.g.*, *Elrod*, 427 U.S. at 362 (plurality op.); *Buckley v. Valeo*, 424 U.S. 1, 64 (1976) ("[S]ignificant encroachments on First Amendment rights . . . cannot be justified by a mere showing of some legitimate governmental interest.").

legislation affecting speech appears underinclusive, *i.e.*, where it singles out some conduct for adverse treatment, and leaves untouched conduct that seems indistinguishable in terms of the law's ostensible purpose, the omission is bound to raise a suspicion that the law's true target is the message."). Accordingly, the Court looked for "a closer fit between [the] law and its apparent purpose than for other legislation." *Id.* at 805.

Here, as in *News America*, plaintiffs challenge a law that targets a single group (private charter bus operators in King County, Washington that are willing and able to service the routes at issue), while hundreds (if not thousands) of other similarly situated entities are free to exercise their full right to challenge local public competitors under the Charter Rule. *Cf. Cal. Motor Transp.*, 404 U.S. at 513 ("Petitioners, of course, have the right of access to the agencies and courts to be heard on applications sought by competitive highway carriers."). Because "[t]he safeguards of a pluralistic political system are often absent when the legislature zeroes in on a small class of citizens," and given "Congress' exclusive focus on a single [geographic area]," *News Am.*, 844 F.2d at 813, as well as the burden it places on plaintiffs' fundamental First Amendment rights, there is a need for greater scrutiny of the Murray Amendment than "casual" rationality review.[27] *Id.* at 811; *see also id.* at 813 ("Congress' exclusive focus on a single party clearly implicates values similar to those behind the constitutional proscription of Bills of Attainder."); *Walsh v. Brady*, 927 F.2d 1229, 1239 (D.C. Cir. 1991) (Williams, J., concurring) ("Some form of heightened scrutiny . . . is appropriate where the ban is so narrow as to arouse

---

[27] The Court does not rule out the possibility that strict or intermediate scrutiny might be appropriate in this instance. *Cf. U.S. Postal Serv. v. Hustler Magazine, Inc.*, 630 F. Supp. 867, 875 (D.D.C. 1986) ("We can discriminate among types of petitions defendants may wish to present only if the distinction is 'tailored to serve a substantial governmental interest." (quoting *Mosley,* 408 U.S. at 99)). Rather, as in *News America*, there simply is no need to decide this question, because "[w]hat suffices for this case is that more is required than 'minimum rationality.'" 844 F.2d at 814.

suspicion . . . that the legislature could have been retaliating against a speaker's message or attempting 'to pick and choose only a few to whom they will apply legislation and thus to escape the political retribution that might be visited upon them if larger numbers were affected.'" (quoting *Ry. Express Agency, Inc.*, 336 U.S at 112-13 (Jackson, J., concurring) (internal citations omitted)).

### B. The Standard Applied

Defendants argue that the Murray Amendment was in "direct response to numerous complaints that were logged by area fans and sports organizations" and was designed to ensure that fans had an "affordable way to get to games in [the] region." (Opp'n at 32-33; *see id.*, Ex. 3.) Senator Murray, in a press release announcing the provision, cited "private charters that were unable to accommodate handicapped fans, drastically increased fees for service, inconvenient and delayed staging, and increased congestion." (*Id.*, Ex. 3) Defendants maintain that because these are "plausible" reasons for Congress' action, the Court's inquiry should end. (Opp'n at 33.)

The Court disagrees, for this standard is too lax under the rationale of *News America*. While more competitive fares, better access, and less congestion are certainly rational legislative goals, Congress' method – singling out one publicly-subsidized operator for exemption from a provision of the Federal Transit Act – is "astonishingly underinclusive." *News Am.*, 844 F.2d at 814. There is no suggestion that the problems cited by Senator Murray are not present in other jurisdictions or that King County is somehow unique.[28] Indeed, it appears that there are other publicly-subsidized transportation providers in Seattle, Washington (the area served by KCM)

---

[28] Indeed, Senator Murray indicated in her press release that she is seeking to address this issue "on a larger scale" as the transportation bill comes up for reauthorization. (Opp'n, Ex. 3.)

for which the Rule continues to be enforced.[29]  The obvious underinclusiveness of the

Amendment "undermines the likelihood of a genuine [governmental] interest." *F.C.C. v. League*

*of Women Voters of California*, 468 U.S. 364, 396 (1984) (quoting *First Nat'l Bank of Boston v.*

*Bellotti*, 435 U.S. 765, 792 (1978)).  It is true that Congress "need not address a perceived

problem all at once." *News Am.*, 844 F.2d at 815.  But forcing a tiny minority to endure the

abrogation of their right to petition while allowing everyone else to enjoy that right[30] is, at best,

tangentially related to defendants' stated goals.  *See, e.g., id.* at 815 ("[C]ourts reject the facile

one-bite-at-a-time explanation for rules affecting important First Amendment values.").

Nor have defendants shown that the Murray Amendment was at all tailored to its

purported goals.  *See Kusper v. Pontikes*, 414 U.S. 51, 59 (1973) ("If the State has open to it a

less drastic way of satisfying its legitimate interests, it may not choose a legislative scheme that

broadly stifles the exercise of fundamental personal liberties.").  For instance, it seems plausible

that expanding the grounds for exemptions to the Charter Rule where private charter service has

been shown to be inadequate or too costly would have an effect similar to, if not greater than the

_____

[29] U.S. Dep't of Transportation, FTA Grantees, *at* http://www.fta.dot.gov/about/about_
FTA_22.html (listing five other funding recipients in Seattle) (last visited June 9, 2010).

[30] Defendants argues that Congress "has often exempted state specific projects from
generally applicable federal laws" and cites as support *National Coalition to Save Our Mall v.
Norton*, 161 F. Supp. 2d 14 (D.D.C. 2001), and *Sequoyah v. Tennessee Valley Authority*, 480 F.
Supp. 608 (E.D. Tenn. 1979).  (Opp'n at 33.)  However, plaintiffs in the *National Coalition* case,
which concerned an exemption from environmental compliance regulations, did not assert a
violation of their First Amendment rights or any right "enjoyed by other citizens." *Id.* at 22, 24.
By contrast, the Murray Amendment encumbers plaintiffs' First Amendment right to petition, a
right that is enjoyed by all other similarly situated private charter bus operators.  *Sequoyah*
concerned the government's efforts to impound land that plaintiffs (two bands of the Cherokee
Indian nation) considered sacred.  *See* 480 F. Supp. at 610.  Plaintiffs claimed the impoundment
violated their First Amendment right to free exercise of religion, but the court found that the
impoundment did not burden religious freedom.  *Id.* at 612.  To the extent that the background of
the case involved Congress' exemption of the Tennessee Valley Authority from certain
requirements of the Endangered Species Act, this exemption did not, in contrast to the Murray
Amendment, burden any person or entity's fundamental rights.

Murray Amendment with respect to the problems identified by defendants, without burdening plaintiffs' First Amendment rights. Moreover, the Amendment itself merely states that the FTA may not use funds to investigate possible Charter Rule violations by one publicly-subsidized entity, not that this entity is required to provide lower prices and more convenient service for the public.[31]

In short, the Court concludes that such a tenuous relationship barely withstands rational basis scrutiny, much less the "closer fit" required by *News America*. Accordingly, the Court finds that the Murray Amendment violates plaintiffs' rights under the First and Fifth Amendments.[32]

## CONCLUSION

For the foregoing reasons, the Court finds the Murray Amendment to be unconstitutional and grants judgment on behalf of the plaintiffs.[33] A separate Order accompanies this Memorandum Opinion.

_____/s/_____
ELLEN SEGAL HUVELLE
United States District Judge

DATE: June 9, 2010

---

[31] In fact, according to the KCM website announcing its game day service, KCM will no longer provide charter service to Sounders games, reinforcing that the Murray Amendment does not require or ensure any level of service that might address the concerns cited by Senator Murray. News Release, King County, Metro Transit 'Back In The Game' With Special Service To Sounders and Mariners Games, *available at* http://www.kingcounty.gov/transportation/kcdot/ NewsCenter/NewsReleases/2010/March/nr032910_gameday.aspx (last visited June 9, 2010).

[32] Plaintiffs also challenge the Murray Amendment on due process and separation of powers grounds. However, it is "unnecessary to address these contentions . . . in view of [the Court's] finding of a violation of the [freedom of petition] and equal protection guarantees of the First and Fifth Amendments." *News Am.*, 844 F.2d at 805 n.8.

[33] Given this ruling, the pending motions for preliminary injunction are denied as moot.